**JWK INTERNATIONAL CORPORATION,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 01–685C.

United States Court of Federal Claims.

Filed Under Seal: May 3, 2002.

Published: May 21, 2002[1].

1. This opinion was issued under seal on May 3, 2002. The parties were given an opportunity to propose redactions; however, no such redactions were suggested and, therefore, the opinion is now published in original form. The court has made one minor correction to its prior opinion that does not affect the merits herein.

Cyrus E. Phillips, IV, Washington, D.C. for plaintiff.

Richard P. Schroeder, Civil Division, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCallum, Jr.

## OPINION

ALLEGRA, Judge.

This bid protest action is before the court on the parties' cross-motions for judgment on the administrative record. In this case, defendant initiated an evaluation, under OMB Circular A–76, of whether certain services at a military base should be provided by a private contractor as opposed to government employees. As part of this process, it solicited proposals from private contractors— plaintiff was the only firm to respond to this solicitation. Plaintiff avers that defendant acted in arbitrary and capricious fashion, and otherwise contrary to law, in evaluating its proposal and conducting the A–76 process. After careful consideration of the briefs filed by the parties, the oral argument, and for the reasons discussed below, the court **DENIES** plaintiff's motion for judgment on the administrative record and **GRANTS** defendant's cross-motion for judgment on the administrative record.

## I. BACKGROUND

On December 21, 2000, the Naval Facilities Engineering Command (NFEC) issued Solicitation Number N62470–00–R–5205 (the Solicitation), seeking proposals for the performance of maintenance and motor transport services at Marine Corps Air Station Cherry Point (Cherry Point) in Havelock, North Car-

olina. The Navy issued the Solicitation in support of a cost comparison study it was conducting under OMB Circular A–76 and 32 C.F.R. § 169a.15(d) (2001).[2] The Solicitation envisioned a negotiated procurement and, toward that end, sought cost comparison information for an array of services[3] to be provided at up to nine different sites in the Cherry Point area. It proposed a contract with a base period of one year and a maximum of two one-year options. The Solicitation cautioned that: "The Government intends to evaluate proposals and award a contract without discussions with offerors (except clarifications as described in FAR 15.306(a)). Therefore the offeror's initial proposal should contain the offeror's best terms from a cost or price and technical standpoint."

The Source Selection Plan (the Plan) described the process the NFEC was to use in reviewing proposals received in response to the Solicitation. Consistent with the A–76 Circular, the Plan first required the NFEC to assess and evaluate the commercial sector proposals. The best of the commercial proposals would then be compared to the government's most efficient organization (MEO). Responsibility for conducting the initial review of the commercial proposals was split between two boards. A Technical Evaluation Board (TEB) was to evaluate the offeror's technical and management proposals, as well as its past performance and corporate experience, while a Price Evaluation Board (PEB) conducted a review of the price offered. Under the Solicitation, the two factors reviewed by the TEB were approximately equal in weight to each other and, when combined, were of equal importance to price. Paragraph VIII of the Plan indicated that "[a]n unacceptable rating for either the technical and management factor or the past performance and corporate experience factor will constitute an unacceptable rating for the entire technical proposal."

The TEB and the PEB were to conduct their reviews separately, but concurrently, and then submit separate reports to the Source Selection Board (SSB). After reviewing these reports, the SSB was to recommend to the Source Selection Authority (SSA) the action to be taken on the proposal. The function of the SSB also included determining whether to conduct any further information exchanges (*e.g.*, clarifications or discussions) with offerors. The ultimate selection of the successful commercial offeror was to be made by the SSA, who would then compare that proposal with the MEO. The SSA also appointed the members of the SSB, TEB, and PEB. The final member of the source selection team was the Contracting Officer (CO), who was responsible for conducting any exchanges deemed appropriate by the SSB and for implementing the final decision of the SSA.

On September 24, 2001, JWK International Corporation (JWK), a minority-owned small business, submitted an initial private sector competitive proposal in response to the Solicitation—the only proposal received. The TEB report, submitted October 31, 2001, assessed JWK's technical and management proposal as poor with high risk for the government. For both of the key factors reviewed, the TEB identified numerous specific weaknesses (instances where the proposed methods were less than desirable) and deficiencies (instances where the proposal did not conform with the solicitation requirements). For example, the report identified 10 weaknesses and 7 deficiencies in connec-

2. As succinctly described by the Supreme Court, "Office of Management and Budget Circular A–76 generally directs federal agencies to 'contract out' to the private sector their non-'governmental' activities (e.g., data processing) unless certain specified cost comparisons indicate that the activities can be performed more economically 'in house.'" *Dept. of Treasury, I.R.S. v. Federal Labor Relations Authority*, 494 U.S. 922, 925, 110 S.Ct. 1623, 108 L.Ed.2d 914 (1990). For a more detailed description of the A–76 procedures, *see Am. Fed'n of Gov't Employees, AFL–CIO v. United States*, 258 F.3d 1294, 1296 (Fed.Cir.2001), *cert.* *denied,* — U.S. —, 122 S.Ct. 920, 151 L.Ed.2d 885 (2002).

3. The specified services included: furnishing appliance service calls; mechanical, plumbing and electrical services; maintenance of outdoor electrical distribution, lighting, and sprinkler equipment; operation of the central heating plant and water distribution, sewer and waste-water treatment systems; refuse collection and disposal; change of tenant maintenance; integrated pest management; and maintenance for garrison mobile equipment and vehicle services.

tion with JWK's proposed staffing plan and organizational chart. These included failing to identify overhead/support personnel and fully allocate equipment, as well as understaffing certain key functions, including operating the central heating plant and conducting necessary safety and environmental protection programs. Overall, the TEB report identified 68 weaknesses, 19 deficiencies and 12 unsubstantiated strengths (favorable assertions made by the offeror with no supporting data provided) in JWK's technical proposal.

The TEB also reviewed references submitted by JWK to ascertain its past performance and corporate experience. In accordance with the Solicitation, the desired focus was on contracts similar in magnitude and complexity to that anticipated by the Solicitation, in which the work was similar in type, volume and quantity to that being sought. The TEB, however, determined that none of the references JWK submitted were relevant in size or scope to assessing its past performance experience and corporate experience. In this regard, its report stated:

> Of the four contracts submitted by JWK, none of the four are considered particularly relevant. They appear to range from $600K/year to $8M/year. The offeror's largest project they offer as a prime contractor is slightly less than half the size of our project. In the smallest contract ($600K/yr), JWK performs services similar to our housing requirements but only at 246 houses which is less than 10% of our the houses in our contract. In their largest contract ($8M/yr at 7 bases in Korea), they appear to have performed some of the same type of work (HVAC, boilers, QC, grounds maintenance, generator maintenance, Motor T work). However, the of-

feror has not provided sufficient information to convince the TEB that the work is really similar to the work in our project (size and capacities of equipment, limits of liabilities, etc.). For example, the three boilers operated in Korea together are smaller than one boiler at the CHP in our solicitation. The offeror also did not provide sufficient information to show how some of the other work that they mention in their brief narrative (such as runway lighting, pavement sweeping, HVAC, boilers) might be like the work at MCAS Cherry Point.

The TEB also noted that the evaluations submitted by JWK's previous customers showed performance problems. Hence, JWK received a "poor" rating from the TEB for both past performance experience and relevant corporate experience.[4]

JWK's cost proposal fared no better with the PEB. The PEB determined that JWK's proposal suggested that it had misconstrued the Solicitation. Discrepancies occurred within the line items for specific tasks, typically involving the number of labor hours allocated[5] and the direct material costs anticipated.[6] Summarizing these concerns as they related to JWK's direct labor proposal, the PEB, for example, stated:

> The PEB's analysis of the Direct Labor portion of JWK's offer indicates a significant difference between JWK's and the government's perception of what is required under this contract. The difference is evident in choice of labor categories utilized, direct labor rates for supervisory employees, and in direct labor hours to perform the work.

The PEB identified other concerns with respect to JWK's proposals for materials, on-

---

4. The TEB considered the experience of JWK's only named sub-contractor to be both relevant to the proposed work and high in quality. However, because the firm was scheduled to conduct only 25 percent of the anticipated work and would not be obligated to complete the project, this determination did not alter the TEB's conclusion that JWK's experience was unsatisfactory.

5. For example, JWK allotted zero hours to developing and maintaining a safety program, while the government allocated 5,556 hours to this

effort. In contrast, the number of hours JWK proposed for station dumpster refuse collection was 4.4 times greater than the government's estimate.

6. For example, JWK specified a lump sum allocation of $6,058.64 for material used to monitor and maintain government furnished property, while the government estimated a total of $100,613.08 for that task. The government's expected price was 16 times JWK's proposal.

site overhead, G & A and profit. For example, as to on-site overhead costs, the PEB noted that JWK's proposal was for $367,836, as compared to a government estimate of $1,848,778. Commenting on this difference, the PEB report states that "the PEB believes that JWK has not considered all of the necessary requirements for managing and administering this contract." Overall, JWK's proposed price for the base year of the contract was 72 percent of the government estimate.

While the SSB concurred with most of the findings of the TEB and the PEB, it modified the TEB's rating of JWK's past performance. While agreeing with the PEB that none of the contracts JWK submitted as references were comparable in size and complexity to the Cherry Point project, the SSB changed JWK's rating from "poor" to "neutral" for this criterion citing FAR § 15.305(iv),[7] which provides that "[i]n the case of an offeror without a record of relevant past performance . . ., the offeror may not be evaluated favorably or unfavorably on past performance." The SSA approved the SSB's determination that JWK's proposal receive an overall rating of "poor." JWK sought a debriefing with the contracting officer in response to this decision. During that debriefing, held December 5, 2001, JWK was informed that its proposal had been rejected and that the work contemplated in the Solicitation would instead be performed under an Inter–Service Support Agreement. The stated rationale for this decision was that JWK's proposal contained so many weaknesses, deficiencies and inconsistencies that it would require a major revision to correct all of them. The CO summarized the conclusions of the SSB, identifying significant elements of concern in the proposal. JWK was not given an opportunity to explain its proposal at the debriefing or at anytime since.

JWK filed suit in this court on December 10, 2001, challenging the NFEC's rating and the rejection of its proposal as unreasonable, irrational and contrary to law. JWK's complaint seeks a declaration that the NFEC's treatment of its proposal was arbitrary and capricious and in contravention of procurement laws and regulations. Plaintiff also seeks a permanent injunction ordering defendant to conduct a reopened Commercial Activities Study, limited to JWK and conducted by a new SSA. Additionally, JWK seeks a declaration that it is entitled to equitable relief and money damages for NFEC's breach of the implied-in-fact contract of good faith and fair dealing that was established when JWK responded to its solicitation. Oral argument on the parties' cross-motions for summary judgment on the administrative record was held on April 24, 2002.

## II. DISCUSSION

 We begin with common ground. In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1994). *See also* 28 U.S.C. § 1491(b)(4) (1994 & Supp. V 1999). Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated that "[t]o make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed.Cir.2000).[8] Accordingly, this court will interfere with the government procurement process "only in ex-

---

7. All FAR references are to the Federal Acquisition Regulations (48 C.F.R.). All references herein to the Code of Federal Regulations are to the 2001 version, unless otherwise noted.

8. By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the

relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). *See also Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

tremely limited circumstances." *CACI, Inc.—Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co., Inc.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). Indeed, a protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement[9] under 48 C.F.R. § 15.605(c). *See Mangi Envtl. Group, Inc. v. United States,* 47 Fed.Cl. 10, 15 (2000); *see also TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327 (Fed.Cir.1996); *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir. 1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980)).

■ Generally, in bid protest cases, it is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear prejudicial violation of applicable statutes and regulations. *See 126 Northpoint Plaza Ltd. P'ship v. United States,* 34 Fed.Cl. 105, 107 (1995); *see also ManTech Telecomm. & Info. Sys. Corp. v. United States,* 49 Fed.Cl. 57, 64 (2001) (and cases cited therein), *aff'd* (per curiam), 30 Fed.Appx. 995, 2002 WL 418168 (2002); *Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 566 (2000). Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). Finally, because injunctive relief is so drastic in nature, the plaintiff must demonstrate that its right to such relief is clear. *See ManTech,* 49 Fed.Cl. at 64 (and cases and authorities cited therein).

Plaintiff arrays its forces in a three-pronged legal assault on the NFEC's evaluation decision. Its first sally—which presents an issue largely of first impression in this court—contends that the review of its proposal was tainted by prejudicial conflicts of interest because certain of the individuals on the TEB and the SSB worked at Cherry Point. Probing further, it then volleys that the TEB's analysis of its technical, management and past performance submissions was arbitrary, capricious and otherwise contrary to law. JWK's remaining foray asserts that defendant acted contrary to law in failing to hold further communications with JWK regarding perceived deficiencies in its submission prior to rejecting that proposal. The court will deal with these assertions *seriatim.*

**A. The Alleged Conflicts of Interest.**

■ JWK first charges that the evaluation of its proposal was tainted by prejudicial conflicts of interest because four of the eleven people comprising the TEB and SEB worked at Cherry Point, including one who worked in one of the functions being studied. JWK alleges that the inclusion of these individuals on the various source selection teams violated OMB Circular A–76 and FAR § 3.101–1.

In conducting government business, including the evaluation of proposals under an A–76 cost comparison study, government employees should avoid any conflicts of interest or even appearances of such conflicts. In this regard, FAR § 3.101–1 exhorts that "[g]overnment business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none." Because this section does not provide specific guidance regarding what may constitute a conflict, the GAO has found instructive the provisions of FAR subpart 9.5, which provide more specific conflict rules, albeit for government contractors.[10]

9. FAR § 2.101 defines "best value" as "the expected outcome of an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement."

10. For example, in attempting to fill in the gaps, the GAO has concluded that "in determining whether an agency has reasonably met its obligations to avoid conflicts under FAR § 3.101–1, FAR subpart 9.5 is instructive in that it estab-

lishes whether similar situations involving contractor organizations would require avoidance, neutralization or mitigation." *Battelle Memorial Institute,* 98–1 C.P.D. ¶ 107 at 7 (1998); *see also The Jones/Hill Joint Venture,* 2001 C.P.D. ¶ 194 at 9 (2001). While not bound by decisions of the GAO, this court has historically afforded deference to them. *See E.W. Bliss Co. v. United States,*

Thus, for example, guidance on the issue before the court may be drawn from former FAR § 9.501(d), which stated that a conflict of interest may be found to exist when, "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired." FAR § 9.501(d) (2000). A desire to avoid such conflicts of interest also is stressed in OMB Circular A–76, a recent revision to Part I of which states—

> "[t]he Government should establish a source selection evaluation or advisory team. Individuals who hold positions in the function under study should not be members of the team, unless an exception is authorized by the head of the contracting activity. Exceptions will be authorized only in compelling circumstances and, in such cases, the head of the contracting activity shall provide a written statement of the reasons for the action."

OMB Circular A–76 Revised Supplemental Handbook, 65 Fed.Reg. 54570 (Sep. 8, 2000).

Predating this revision, various decisions already had held that at least the appearance of a conflict of interest exists where, in an A–76 cost comparison, an evaluator holds a position that is within the scope of the study and is subject to being contracted out. Thus, in a case involving an A–76 competition, the Comptroller General in *DZS/Baker LLC; Morrison Knudsen Corp.*, 99–1 C.P.D. ¶ 19 at 5 (1999), identified personal conflicts of interest where agency personnel involved in evaluating the commercial offeror's proposal were facing the loss of their jobs should the commercial offeror win the cost comparison study. Explaining this conclusion, the board stated:

> Where, as here, a private-sector offeror submits a technical proposal as part of an A–76 cost comparison study for work currently performed in-house by an agency, and agency personnel holding positions under the study and thus subject to being contracted out are involved in evaluating the commercial offeror's proposal, it seems

self-evident that, as addressed in FAR § 9.501(d), the agency evaluators are potentially unable to render impartial assistance or advice to the contracting officer— their objectivity in performing the evaluation may be impaired. Indeed, as addressed analogously in FAR § 9.505–3, in this situation agency evaluators are in effect evaluating a competitor's proposal. Accordingly, a conflict of interest exists which calls for the agency to take appropriate remedial action.

Noting that fourteen of sixteen evaluators, including four of six "core evaluators" and all ten technical advisors, were found to have such conflicts, the GAO concluded that these conflicts were too significant to mitigate and required the agency to reconstitute a new evaluation team.

The GAO reached a very different result in *IT Facility Services–Joint Venture*, 2000 C.P.D. ¶ 177 at 3,6 (2000). There, the protester complained that four of the seven members of the Source Selection Evaluation Board were employees in the functional area under study. The Army, the agency involved, noted that none of the individuals involved were at risk of losing their jobs and, based upon guidance previously published by the Army, asserted that such individuals were not "directly affected" by the cost comparison decision and thus could serve on an evaluation board. Agreeing with the Army, the GAO stated:

> Here, we find reasonable the Army's determination that the inclusion of these Fort Lee employees on the SSEB did not create a conflict or apparent conflict of interest. The protestor has not shown that these employees will be directly affected by the outcome of the procurement; that is, none of these employees' positions are subject to being contracted out.

*Id.* at 12. The GAO continued that "[a]lthough IT is concerned that these employees may yet be biased because of their employment within the areas under study, these concerns are too speculative and tenuous to establish the agency's judgment was unreasonable." *Id.*

33 Fed.Cl. 123, 134 (1995), *aff'd*, 77 F.3d 445 (Fed.Cir.1996).

The GAO, nonetheless, concluded that at least the appearance of a conflict of interest existed with respect to one SSEB member who was married to someone holding a position under study that was subject to being contracted out. But, distinguishing the situation presented from that in *DZS/Baker LLC, supra,* the GAO opined that "[a]lthough it is true ... that we presumed prejudice to the protester in DZS/Baker .., in that case, the conflict of interest was so broad and severe (14 of the 16 evaluators held positions under study) that there was no objective way (such as by reviewing the evaluation record) to ascertain whether the protester was potentially affected by the conflict." *Id.* Rejecting the protest, the GAO noted that the protester's proposal had received marginal and unacceptable ratings from evaluators who were not conflicted and, on that basis, concluded that the protester had not been prejudiced because of the single evaluator's apparent conflict of interest.

As between *DZS/Baker* and *IT Facility Services,* the case *sub judice* more strongly resembles the latter. On brief, plaintiff alleged that two members of the TEB, one advisor to the TEB, and one member of the SSB are "individuals who hold positions in the function under study," thereby creating a prejudicial conflict of interest. But, as defendant points out, plaintiff has its facts wrong. Thus, two components of the Cherry Pont Facilities Directorate were being reviewed under this cost comparison: the Facilities Maintenance Department and the Motor Transport Department. Major Furtado, who served on the TEB, supervised the Motor Transport Department, and thus was directly associated with one of the functions under study. By contrast, the other three individuals identified by plaintiff did not work in either of the functions under study: (i) Robert Lawrence, a civilian employee and a member of the TEB, served in a supervisory capacity in the Facilities Engineering Department in the Facilities Directorate; (ii)

George Radford, a civilian and a member of the SSB, served in a supervisory capacity in the Environmental Affairs Department of the Facilities Directorate; and (iii) Joseph Bizzell, a civilian and the advisor to the TEB, served in the Safety and Standardization Department, a unit organizationally separate and distinct from the Facilities Directorate.[11] Accordingly, only one of the persons identified by plaintiff, Major Charles Furtado, actually worked in one of the areas under study. At least initially, then, the court must focus on the potential conflicts posed by his participation in the evaluation of JWK's proposal.

Major Furtado's presence on the TEB clearly violated the policy established in part I of the revised A–76 Circular against having individuals in the functions being studied serve on evaluation boards. As such, his participation also arguably contravened FAR § 3.101. In urging that such a violation of the regulation actually occurred, plaintiff notes that the recent revisions to the circular were not effective for the procurement reviewed in *IT Services,* and that the GAO thus did not consider their impact in rendering its conflicts rulings. This is true, *see IT Facility Servs.,* 2000 C.P.D. ¶ 177 at 12 n. 11, but overlooks the fact that the GAO, in that case, considered the impact of Army guidance which, similar to comments in the recent revision in Circular A–76 (see below), prohibited individuals "directly affected by the cost comparison decision" from participating on an evaluation board. The GAO ultimately concluded that Army had acted reasonably in concluding that individuals whose jobs were not at jeopardy were not "directly affected" under its policy. As noted above, in so concluding, the GAO noted that the broader conflict concerns raised by the protester in that case were "too speculative and tenuous to establish that the agency's judgment was unreasonable." *Id.* at 12.

■ But, even if we assume *arguendo* that Major Furtado's presence on the TEB violat-

---

11. One member of the PEB also worked in the Contracting Department at Cherry Point. Plaintiff originally included this person, Kathy Rogers, in its conflict of interest allegations; defendant directly challenged that allegation, but plaintiff made no reference to it in its reply brief. Ms. Rogers worked in the Supply Directorate under the Chief of Staff, a department separate in both form and function from the ones under study. There is no indication that Ms. Rogers's job would be affected by the privatization of the work at issue.

ed FAR § 3.101, the fact of the matter is that plaintiff was not prejudiced by his participation for at least several reasons. First, Major Furtado was only one of six individuals on the TEB and was not the chair of that board. Moreover, he was one of thirteen individuals involved in assessing JWK's technical proposal and there is no indication in the administrative record that any of those individuals disagreed with the dozens of identified deficiencies in that proposals—deficiencies that led both the TEB and the SSB to rate the proposal as "poor." *See TDF Corp.*, 2001 C.P.D. ¶ 178 at 9 (2001) (A–76 conflict-of-interest protest denied for lack of prejudice, even though two members of the nine-person evaluation team held positions in the function under study, because the protester's proposal would have been properly deemed unacceptable even in the absence of the two evaluators at issue). Indeed, the record reveals that the portion of JWK's technical proposal that had the fewest identified weaknesses dealt with motor transport, the area that Major Furtado supervised. Second, and most damaging to plaintiff's cause, even had JWK's technical proposal been evaluated as "superior," it would not have received an award based upon the discrepancies and deficiencies identified in its pricing proposal by the PEB. Major Furtado did not participate on the PEB that rendered this decision, nor did he participate in the SSB that affirmed that decision. Finally, it is notable that, as a military officer, Major Furtado, was not concerned so much with the loss of his employment, as the loss of his assignment—while not eliminating the apparent conflict, this fact clearly diminishes its impact, making the preceding observations regarding the overall lack of prejudice exhibited here all the more tenable.[12] In short, even assuming the existence of conflict, plaintiff has not shown that "had it not been for the alleged error in the procurement process, there was a reasonable

likelihood that [it] would have been awarded the contract." *Data General Corp.*, 78 F.3d at 1562.

Plaintiff, however, actively campaigns for a broader standard of accountability—one that would preclude individuals from serving on evaluation boards even if they were in components that only interrelate with or rely upon those under study. Such a standard, plaintiff asserts, would sweep in Messrs. Lawrence, Radford and Bizzell, all of whom held supervisory-type positions in components that worked with the two functions under study, particularly since a notice issued to the Cherry Point staff warned that, in the event of contracting, "[i]ndirect labor in support of Facilities will be reduced." However, plaintiff points to no authority for this heightened conflict standard, save some commentary in the recent revision of the OMB A–76 Circular. This commentary states that "OMB believes that it is a good business practice to exclude individuals who are directly affected by an A–76 cost comparison from participating in a Source Selection Board (SSB)" and notes further that "the selection process is most effective when decision-makers are chosen independent of the function under review."

But, while this commentary focuses on individuals who are "directly affected" by an A–76 comparison, plaintiff's substitute standard has a distinctly "indirect" flavor and essentially would exclude from evaluation boards any managers who, in performing their duties, rely on the services provided by a function under study. Adoption of such a far-reaching rule would make it virtually impossible for agencies to use local managers to evaluate centralized functions, such as accounting, budget, systems support or centralized maintenance (the latter a function at

---

12. Despite the clarity of the recent amendment to A–76, there is not widespread consensus as to the detrimental impact of having military personnel working within the area under study serve on the boards reviewing A–76 solicitations. *See GAO Letter to the Office of Government Ethics Regarding Conflicts of Interest in A–76 Cost Comparisons*, 99–2 CPD ¶ 103 at 1 (1999). Comments in response to the proposed change to A–76 suggested that exceptions be made for military personnel whose livelihood was not dependent on the outcome of the study. *See* 65 F.R. 54570. OMB rejected this comment to further what it called "good business practice," but recognized in doing so that "the employment of military service personnel will not be adversely affected by the decision to retain or convert work to or from in-house, contract or Inter–Service Support Agreement performance." *Id.*

issue here).[13] Indeed, while plaintiff denies this, its standard seemingly is broad enough to bar anyone in the supervisory chain above the function under study from participating in a board. This court is unwilling to hamstring agencies in this fashion without some better indication that such conduct constitutes a disqualifying conflict, particularly since the conflict principles of the A–76 Circular have neither been incorporated into the FAR nor the agency's procurement regulations.[14] Indeed, the language cited by plaintiff in the commentary is just that—commentary—and only describes "good business practice," suggesting, by comparison to other more rigorous requirements in the A–76 Circular, that the failure to comply with those practices is not intended to constitute a conflict of interest or even the appearance thereof.

Even were this court to adopt plaintiff's heightened conflict standard, it would be a far cry to conclude that a conflict or apparent conflict occurred here. Contrary to plaintiff's claims, the administrative record does not suggest any symbiotic relationship or close interrelationship between the functions under study and those which the board members supervised, and the court is ill-inclined to adopt plaintiff's conjecture on this point as a substitute for such proof. Even were a conflict shown, plaintiff still has failed to demonstrate prejudice of the sort necessary to support the relief it requests, for as will be discussed in the next segment, the deficiencies in its proposal were many and fundamental. It is to the latter subject that the court now turns.

**B. Whether the review of JWK's proposal was arbitrary and capricious.**

■ JWK argues that the TEB's evaluation of its proposal, as well as the SSB's rejection thereof, was arbitrary and capricious. In evaluating this issue, this court is mindful that "[t]he determination of the relative merits of proposals is the responsibility of the procuring agency since it must bear the burden of any difficulties incurred by reason of a defective evaluation." *Biological Monitoring, Inc.,* 83–1 C.P.D. ¶ 395 at 2 (1983); *see also Arctic Slope World Services, Inc.,* 2000 C.P.D. ¶ 75 at 4 (2000). In light of this, various decisions hold that, in protests challenging an agency's evaluations of an offeror's technical proposal and past performance, review should be limited to determining whether the evaluation was reasonable, consistent with the stated evaluation criteria and complied with relevant statutory and regulatory requirements. *See, e.g., Infrared Technologies Corp.,* 99–2 C.P.D. ¶ 41 at 3 (1999) (evaluation of technical proposals); *Rohmann Serv., Inc.,* 98–2 C.P.D. ¶ 134 at 3 (1998) (evaluation of past performance).

■ JWK first argues that the TEB acted in an arbitrary and capricious fashion in evaluating its technical and management proposal. This assertion, raised only glancingly in JWK's briefs, but more vigorously asserted at oral argument, is woefully short on specifics and never comes to grip with the avalanche of shortcomings identified in the TEB's evaluation of the plaintiff. Thus, among the dozens of deficiencies and weaknesses identified by the TEB were the following: (i) JWK's listing of resources for handling a cooling tower and chiller plant in excess of 250 tons, while the Cherry Point facility included neither a cooling tower nor a chiller plant of the stated size; (ii) the proposal failed to list equipment to perform various contract requirements including refuse collection and disposal services, housing work and monitoring utilities; (iii) the pro-

---

**13.** Indeed, while emphasizing the importance that evaluators "have no personal stake in the process," one commentator has expressed concerns about excluding local officials not in the functions under study, stating that such an approach "may not be a practical one, given the diverse nature of the activities under study and the government's undeniable interest in using its local people, who are both available and already intimately familiar with the nature of the commercial activities under study." *See* Thomas L. McGovern, *The Top 10 "Drags" on Competition in the A–76 Environment,* 36 Spring Procurement Law. 7, 8 (2001).

**14.** Notably, while the comments cited by plaintiff relate to modifications made to part I of the A–76 Circular, only parts II, III and IV of that circular have been made expressly applicable to the Department of Defense and its military departments and agencies. *See* 32 C.F.R. § 169a.15(d) (2001).

posal failed to include trade-level labor for monitoring and maintaining government furnished property, listing only clerical help for a function that required significant preventive maintenance and repair work; and (iv) the proposal contained various discrepancies between the staffing projected by the NFEC for various functions and the staffing proposed by JWK and, at points, was internally inconsistent (*e.g.*, one summary chart showing 125.77 FTEs for productive and overhead functions, while another chart showing 157 FTEs for productive functions alone). Plaintiff has not asserted, let alone demonstrated, that these findings are unsupported by the administrative record or inconsistent with the evaluation criteria. Instead, it offers little more than mere disagreements with the boards' overall assessment of the adequacy of its proposal. Such naked claims, by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious. *See Carlson Wagonlit Travel,* 2001 C.P.D. ¶ 49 at 3 (2001) ("an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably"); *PEMCO World Air Servs.,* 2000 C.P.D. ¶ 71 at 15 (same).

■ Plaintiff is more specific—but no more convincing—in asserting that the TEB and the SSB erred in determining that the contracts JWK submitted for consideration, as evidence of its past performance and corporate experience, were not, in the words of the Solicitation, "similar in magnitude and complexity to that contemplated by the solicitation." Plaintiff asseverates that the board · looked only at the monetary value of these contracts, assertedly rejecting, out of hand, the largest grouping of these contracts because they were only approximate half of the

value of the contract anticipated by the Solicitation. Yet, this factual claim is flatly contradicted by the administrative record (portions of which are quoted in the statement of facts herein), which indicates that the TEB considered not only the dollar value of these prior contracts, but also their scope and complexity. For example, in discussing JWK's Korea contracts the TEB noted differences in the size and capacity of the equipment involved, citing the fact that three boilers at the Korea sites together were not as large as one boiler at the Cherry Point site. In commenting on this same Korea contract, as well as other contracts proffered by plaintiff, the TEB also noted differences in the number of housing units served and regarding limits on liability. Plaintiff has failed to demonstrate that any of these observations were erroneous and, lacking such evidence, this court has no basis whatsoever to disturb the agency's views regarding the relevancy of JWK's past performance.

At all events, plaintiff plainly was not prejudiced by the TEB's evaluation of its past performance. While the TEB rated JWK's past performance as "poor," the SEB changed that rating to a "neutral," citing FAR § 15.305(a)(2)(iv), which requires that an offeror without a record of relevant past performance not be rated favorably or unfavorably on past performance. *See C.W. Over and Sons, Inc.,* 96–2 C.P.D. ¶ 223 at 6–7 (1996). Under the regulation, however, the SEB was not required to change the TEB's evaluation of JWK's corporate experience proposal—and it did not. Rather, the SEB adopted the analysis of the TEB in rating the corporate experience proposal as "poor." As noted above, plaintiff has not shown that rating to be arbitrary or capricious. In sum, there is ample factual support for the NFEC's determinations and plaintiff's arguments to the contrary are wholly without merit.[15]

---

**15.** Plaintiff also asserts that, in conducting the A–76 comparison here, defendant also violated 10 U.S.C. § 2462 by not conducting a cost comparison despite the rejection of JWK's proposal. Section 2462, however, does not require an agency to conduct a cost comparison if no potentially acceptable proposals are received from outside vendors. Thus, 10 U.S.C. § 2462(b) indicates that the cost comparison requirement applies only when "determining whether to contract with a source in the private sector for the performance of a Department of Defense function on the basis of a comparison of the costs of procuring supplies or services from such a source with the costs of providing the same supplies or services by the Department of Defense."

## C. The failure to allow for further communications.

Finally, plaintiff avers that defendant violated both statute and regulations in failing to communicate with JWK regarding the deficiencies identified in its proposals. This claim is both legally inaccurate and factually without merit.

In making this argument, plaintiff initially rests its case on 41 U.S.C. § 405(j)(1)(C). That statute, however, merely requires the Administrator of the Office of Federal Procurement Policy to prescribe executive agencies guidance regarding the consideration of past contract performance, and indicates only that such policies should ensure that "offerors are afforded an opportunity to submit relevant information on past contract performance" and that "such information submitted by offerors is considered." The requirements of this statute are met by the FAR (see discussion below) and, while, at oral argument, plaintiff's counsel, off-handedly suggested that some of those regulations may be invalid, there is no indication of this in section 405(j)(1)(C) or any other statute cited by plaintiff. Moreover, it bears noting that, under the FAR and the Solicitation, plaintiff was afforded an opportunity to submit relevant information on past contract performance and that information was reviewed.

■ On this communications issue, however, plaintiff suffers no shortage of fall-back positions. Indeed, it next suggests the agency's failure to communicate violates various provisions in the FAR. For example, plaintiff contends that the agency's failure to communicate with it regarding the deficiencies in its proposals violated FAR § 15.306(a)(2). That paragraph, which comes under the heading of "Clarifications and award without discussions," states:

> If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's

past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.

JWK asserts that this provision requires a contracting officer to conduct "clarifications" with any offeror where the agency intends to rely on adverse past performance information on which the offeror has not previously had an opportunity to respond. This court, however, reads no such "requirement" into FAR § 15.306(a)(2), which states, in permissive terms, only that offerors "may" be given the opportunity to clarify certain aspects of proposals, including past performance information. Consistent with prior decisions, this court finds that, under this regulation, an agency representative has broad discretion to decide whether to communicate with a firm concerning its performance history. *See, e.g., A.G. Cullen Constr., Inc.*, 2000 C.P.D. ¶ 45 at 5 (2000); *Rohmann Services, Inc.*, 98–2 C.P.D. ¶ 134 at 8 (1998). *See also Century Elevator Inc.*, 99–2 C.P.D. ¶ 112 (1999).

■ Here, this discretion clearly was not abused. The FAR makes clear that "clarifications" are "limited exchanges" between the government and offerors, FAR § 15.306(a)(1), as compared with more extensive "discussions," which involve more fundamental deficiencies, *see* 48 C.F.R. § 15.306(d). The GAO recently contrasted these two forms of communications, stating:

> [Clarifications] are not to be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal, or otherwise revise the proposal.... Discussions, on the other hand, occur when a contracting officer indicates or discusses with each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal that could be altered or explained to enhance materially the proposal's potential for award.

Here, because there were no technically acceptable commercial proposals, the NFEC never got to the stage of the A–76 study where the cost comparison is required. Circular A–76, indeed, makes this clear when it provides that the government's in-house cost estimate not even be opened until "after selection of the private sector's most advantageous proposal." OMB Circular A–76 Revised Supplemental Handbook, Part I, J.3 (1996).

*Charleston Marine Containers, Inc.*, 99–2 C.P.D. ¶ 84 at 6; *see also Omega World Travel, Inc.*, 2002 C.P.D. ¶ 5 at 6 (2002). Given the circumstances of this case—with literally dozens of fundamental deficiencies having been identified in JWK's proposals—this court believes that the SSB did not err in concluding that the limited exchanges envisioned by FAR 15.306(a) would serve absolutely no utility here. *See Omega World Travel, Inc.*, 2002 C.P.D. ¶ 5 at 6 (improper pricing of proposal not remediable under § 15.306(a), but instead would require the agency to conduct discussions); *Carlson Wagonlit Travel*, 2001 C.P.D. ¶ 49 at 5–6 (§ 15.306(a)(2) does not require clarifications where deficiencies were not "minor or clerical errors"). This conclusion holds especially true as to JWK's past performance information as there is no indication that any of the critical facts concerning JWK's prior contracts were missing or ambiguous—indeed, plaintiff has not pointed to any relevant inaccuracies in the TEB's report concerning its past contracts nor has it offered any new facts that, if presented to the TEB, might have led that board to reach a different relevancy conclusion.[16]

▮ Nor did the SSB violate FAR § 15.306(b) by failing to conduct communications allowing JWK to explain the relevance of its prior contracts. The cited subsection, entitled "Communications with offerors before establishment of the competitive range," addresses "exchanges aimed at determining whether an offeror should be included in the competitive range." *See also Firearms Training Sys., Inc. v. United States*, 41 Fed. Cl. 743, 745 (1998). According to the regula-

tions, these communications may be conducted with offerors "whose past performance information is the determining factor preventing them from being placed within the competitive range," FAR § 15.306(b)(1)(i), or with offerors "whose exclusion from, or inclusion in, the competitive range is uncertain," FAR § 15.306(b)(1)(ii). There are multiple obstacles to applying this provision here though. First, no competitive range was to be established, rendering suspect the application of this entire provision to the solicitation at hand. Second, even if we assume *arguendo* that a competitive range was to be determined, plaintiff's situation fits neither of the circumstances warranting communications—its past performance was rated "neutral" and there were other major deficiencies in its technical and price proposals that clearly would have prevented it from being included within the supposed competitive range. Third, it bears noting that FAR 15.306(b)(3) stresses that the communications authorized "shall not provide an opportunity for the offeror to revise its proposal" and lists the topics that may be addressed, such as ambiguities that lead to perceived weaknesses. *See Firearms*, 41 Fed.Cl. at 745. The deficiencies in plaintiff's proposal, of course, required significant revisions, and thus would not have been solved by the limited communications envisioned by the regulation. In short, plaintiff's attempt to invoke this regulation is like squeezing an elephant's foot into a pony's shoe—no matter how hard it pushes, the shoe just will not fit.[17]

In sum, what plaintiff seeks here is precisely that which the Solicitation warned it might not have—an opportunity, via further

---

**16.** Plaintiff also argues that SSB should have obtained clarifications because JWK's proposal was the only received and there was little to be lost from having such communications. But, it was for the agency to decide, in the first instance, whether something would have been gained from such communications and this court concludes that the agency did not abuse its discretion in concluding that further communications with JWK would be fruitless. The cases plaintiff cites to the contrary are entirely inapposite, dealing with situations where an agency decided to establish a competitive range and then excluded all but one offeror from that range. *See, e.g., Birch & Davis Int'l, Inc. v. Christopher*, 4 F.3d 970, 973–74 (Fed.Cir.1993); *Bean Stuyvesant, L.L.C. v. United States*, 48 Fed.Cl. 303,

341 (2000). These cases hardly deal with the issue of communications at all, let alone with whether communications are required in a case such as this.

**17.** Likewise unavailing to plaintiff is FAR § 15.305(a)(2)(iii). Not only does this section of the FAR not address the standard for determining when communications are necessary to determine whether contracts are relevant, but FAR § 15.305(a)(2)(ii) specifically leaves the relevancy determination to the individual source selection authorities. Again, there is no indication that the NFEC violated any provision of 48 C.F.R. § 15.305.

discussions, to correct major deficiencies in its proposal. With that warning having so plainly been given, plaintiff should not be heard to complain of lost opportunities. *See Omega World Travel,* 2002 C.P.D. ¶ 5 at 6 ("There generally is no obligation that a contracting agency conduct discussions where the RFP specifically instructs offerors of the agency's intent to award a contract on the basis of initial proposals.").

## III. CONCLUSION

Prevailing in a bid protest entails more than the frenzied brandishing of a cardboard sword. Many of plaintiff's arguments inelegantly chant familiar, yet gauzy, generalities—for example, that the government breached its contract of fair dealing—but fail to anchor those concepts to any facts or even any specific allegations that the actions taken here were an abuse of discretion or contrary to law. Absent some indication of bad faith—and here there is none—the government's obligations must be measured not by conclusory allegations, which become no less conclusory by repetition, but by what is reasonable or rational and by what the Solicitation, the FAR and other relevant authorities require (and do not require). Measured by those legal standards, the government's conduct here was neither erroneous nor prejudicial to plaintiff. The relief requested by JWK, therefore, is inappropriate.

In consideration of the above, **IT IS ORDERED:**

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED.**

2. This opinion shall be published as issued after May 30, 2002, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons for that redaction.