INPUT/OUTPUT TECHNOLOGY, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

and

Honeywell, Inc., Intervenor.

No. 98–836C.

United States Court of Federal Claims.

June 11, 1999.

Richard D. Lieberman, Arlington, Virginia, for plaintiff. James S. DelSordo, of counsel.

Jan M. Folena, U.S. Department of Justice, Washington, D.C., with whom were Assistant Director Anthony H. Anikeeff, Director David M. Cohen, and Acting Assistant Attorney General, David W. Ogden, for defendant. Major Richard Gross, Department of the Army, Litigation Division, Arlington, VA, and Joshua Kranzberg, United States Army Materiel Command, Office of the Command Counsel, Alexandria, VA, of counsel.

William L. Walsh, Jr., McLean, Virginia, for intervenor. J. Scott Hommer, III, Wm. Craig Dubishar, and Paul N. Wengert, of counsel.

## OPINION

FIRESTONE, Judge.

This post-award bid protest action comes before the court on the parties' cross-motions for judgment on the administrative record. Plaintiff, Input/Output Technology, Inc.

("IOT") protests the Department of the Army's ("Army" or "defendant") award to Honeywell, Inc. ("Honeywell" or "defendant-intervenor") of a contract for the repair and retrofit of AN/APN–209 Line Replaceable Units ("LRUs"). LRUs are altimeters used in measuring altitude on fixed and rotary wing aircraft. The sole issue for consideration is whether the solicitation required burn-in testing [1] for each repaired and retrofitted LRU.

## FACTS

The facts are undisputed. On February 23, 1998, the Army issued a Request for Proposals ("RFP") for the award of a five-year indefinite delivery/indefinite quantity contract for the repair and retrofit of LRUs. The RFP stated that award was to be made to the best overall proposal that was determined to be the most beneficial to the government. Consideration was to be given to the following factors: (1) technical, (2) performance risk, and (3) price. The solicitation stated:

> Technical is slightly more important than either Performance Risk or Price. ... Offerors are cautioned that an award may not necessarily be made to the lowest price offered.

With respect to the testing of repaired and retrofitted LRUs, which is at issue here, the RFP included several provisions. Attachment 01, paragraph 2.5 of the RFP stated that "upon completion of all repair/retrofit effort, the LRU shall be subjected to and pass the test requirements specified in paragraph 6 of Appendix 1." Paragraph 6 of Appendix 1 was titled "Test Requirements" and provided that, unless otherwise specified, testing should be performed under the following conditions:

| | |
|---|---|
| Ambient temperature: | 75° ± 15°F |
| Humidity: | Up to 95% |
| Altitudes: | Normal Pressure, Ambient |

Appendix 1, paragraph 6.4 also stated that "[e]ach unit shall be subjected to an acceptance test plan and procedure submitted by the contractor and approved by the Government." There was no express reference to burn-in testing in Appendix 1, paragraph 6.

"Burn-in" testing, however, expressly was identified in the RFP in connection with first article testing or "FAT." In particular, Appendix 2 required that first articles be subjected to a "failure-free 24-hour minimum burn-in." The FAT provision further stated that "all first articles shall be repaired and retrofitted ... using the same parts, materials, and repair/retrofit processes to be employed for subsequent repair and retrofit efforts." Finally, the FAT provision reserved the Army's right to waive first article testing for certain offerors. It is not disputed that the Army waived FAT for both IOT and Honeywell in this case.

In addition to the foregoing provisions, Appendix 1, paragraph 2.10 established a "Workmanship" requirement which stated that the LRUs must be "repaired and retrofitted in accordance with the guidance and information contained in the equipment drawings (see Table I)." Table I, in turn, listed four drawings. The caption to Table I stated, "[u]nless otherwise specified in the [RFP], the following drawings and all associated drawings shall be used as references." One of the drawings listed on Table I, Drawing A3060585, contained a further reference to Drawing A3060587. Paragraph 4 of that second drawing—A3060587—identified certain production-related test requirements including a "Production Run–In" and "Burn-In/Debugging."

Finally, the RFP required offerors to submit a Quality Assurance ("QA") Plan with their proposals. The QA provision, paragraph L–7(2)(a)(3), stated:

> The offeror shall address its internal QA procedures used for controlling the quality of the contracted items. Specific elements include, but are not limited to repair, retrofit, procurement of material to support repair and retrofit, receipt and control of incoming material, metrology/calibration, *burning-in of new selective parts*, debugging, ... and other related functions. (emphasis added).

Two offerors, IOT and Honeywell, responded to the RFP. With regard to burn-in

---

1. Burn-in testing involves a 24–hour test that exposes the LRU to extreme temperature and vibration variations in an effort to weed out premature failures.

testing the two offers were very different. In particular, IOT provided for burn-in testing on *all* repaired and retrofitted LRUs, including both first articles and all subsequent units as part of its proposed testing plan under Appendix 1, paragraph 6. Honeywell, in contrast, provided for burn-in testing only for first articles and proposed a different testing plan for all other units in response to Appendix 1, paragraph 6. IOT's total cost proposal (not including first article testing costs) was approximately * * * million.[2] Honeywell's total cost proposal was approximately * * * million (not including first article testing costs) [3].

In accordance with the RFP, both proposals were sent to the Source Selection Evaluation Board ("SSEB") for evaluation. Before finalizing its review, the SSEB exchanged information with both offerors, but the issue of burn-in testing was never raised by either party. Because the SSEB did not consider burn-in testing to be required by the RFP, the SSEB never questioned Honeywell's decision not to include burn-in testing for all LRUs. The SSEB ultimately gave both Honeywell and IOT "outstanding" ratings for their overall technical proposals. Indeed, IOT's proposal to provide burn-in testing for all repaired and retrofitted units was acknowledged as a "major advantage" to IOT's technical proposal.

The SSEB reported its final evaluations to the Contracting Officer on June 16, 1998. On June 26, 1998, the Army awarded the contract to Honeywell, finding that Honeywell's proposal was "the best overall and most beneficial to the government." Thereafter, pursuant to FAR § 15.506(d), IOT requested a debriefing. The debriefing occurred by telephone on July 9, 1998. At the debriefing IOT learned for the first time that the Army did not require a 24-hour burn-in test for all repaired and retrofitted LRUs. The Army then explained to IOT that it ultimately concluded that Honeywell's overall offer was superior. The Army made its deci-

sion by relying upon the SSEB's Source Selection Decision Document, which stated that, "since the proposals submitted by both offerors [were] essentially equal, Honeywell's proposal offer[ed] a better value to the Government since its price is significantly less than [IOT's]."

On July 13, 1998, IOT filed a bid protest at the General Accounting Office ("GAO"). IOT raised several arguments at the GAO hearing, including its argument that the RFP called for burn-in testing on *all* repaired and retrofitted LRUs. The Army disputed each of IOT's contentions and reiterated its view that the RFP did not call for burn-in testing on all units. The GAO sustained the Army's decision on all grounds. With regard to the burn-in issue, the GAO did not reach the merits of IOT's argument. Rather, the GAO dismissed the claim on the ground that IOT could not show a reasonable likelihood of receiving the award because its price, even without the burn-in requirement, was more than $6 million greater than Honeywell's price. On October 21, 1998, the GAO denied IOT's protest.

On November 2, 1998, IOT filed a post-award bid protest in this court, seeking a preliminary and permanent injunction. Honeywell was granted leave to intervene on November 9, 1998. Pursuant to a stipulated scheduling order, oral argument on the parties' cross-motions for judgment on the administrative record was heard on May 19, 1999.

## DISCUSSION

### I. The Scope and Standard of Review

The court's jurisdiction over post-award bid protest actions is provided for under the Tucker Act, 28 U.S.C. § 1491(b)(1) (1994 & Supp.1999). Under that statute, review of a post award bid protest action is based on the administrative record developed before the relevant contracting agency.[4] This court is

---

2. Proprietary pricing data has been removed at the request of the plaintiff.

3. As mentioned above, the first article testing costs were removed from both offers because the

Army decided to waive first article burn-in testing for both offerors.

4. Although the scope of review of the contract award decision ordinarily is limited to the administrative record, this court has recognized

required to apply the standard of review prescribed in the Administrative Procedure Act ("APA"), which authorizes a court to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994); *see Southfork Sys., Inc. v. United States,* 141 F.3d 1124, 1132 (Fed.Cir.1998); *Miller–Holzwarth, Inc. v. United States,* 42 Fed.Cl. 643, 649 (1999); *Dubinsky v. United States,* 43 Fed.Cl. 243 (1999). It is against this backdrop that the court turns to the merits of IOT's complaint.

## II. Applicability of the Burn–In Requirement

IOT's principal argument before this court is that the RFP at issue in this case included a clear requirement for burn-in testing on all repaired and retrofitted LRUs. In the alternative, IOT contends that the RFP specifications were ambiguous, and therefore the contract must be construed against the Army under established contract interpretation principles. For these reasons, IOT contends

that Honeywell's proposal is non-conforming and that the award to Honeywell must be set aside. IOT urges this court to require the Army to reconsider IOT's bid against a mandatory burn-in testing requirement, which IOT presumably believes may lead to it receiving the award.[5]

In response to these arguments, defendant and defendant-intervenor contend that the RFP specifications unambiguously show that burn-in testing was not required. Alternatively, they argue that even if the contract specifications were ambiguous with respect to burn-in testing, contract law principles governing patent ambiguities dictate that IOT was obligated to seek a clarification. Because IOT failed to do so, defendant and defendant-intervenor argue that any ambiguity must be construed against IOT.

For the reasons stated below, the court finds that the RFP at issue did not establish a clear burn-in testing requirement for all repaired and retrofitted LRUs, and therefore the Army did not err in awarding the con-

limited circumstances where it may allow the parties to supplement the administrative record. *See Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997). In the present case, IOT initially sought to depose Mr. Donald Chi, the Chairman of the Technical Review panel for the Army's SSEB. IOT argued that Mr. Chi's testimony was needed to clarify whether the RFP included a burn-in testing requirement. The use of testimony to fill gaps in the record where the action is not adequately explained is one of the few recognized exceptions for supplementing the record. *See id.* The court granted a limited deposition of Mr. Chi on December 1, 1998.

When questioned, Mr. Chi testified that burn-in testing for all LRUs was *not* a requirement in the RFP. Specifically, the exchange was as follows:
Q: My question is, ... is the burn-in debugging one of the test requirements listed in drawing A3060587?
A: Yes.
Q: Now the contractor that's performing the repair and retrofit contract, is he required to perform this test requirement that's referenced in drawing A3060595?
A: No.
Q: Why?
A: It's not in the standard of work.
On January 26, 1999, defendant (rather than IOT) moved to supplement the administrative record with Mr. Chi's deposition. The court granted defendant's motion on January 27, 1999. IOT subsequently filed a motion in opposition to supplementation of the record, or, in the alterna-

tive, to present its own expert testimony. IOT wished to show that an expert in government contracts would have reasonably believed based on his reading of the RFP that burn-in testing was required. Both defendant and defendant-intervenor opposed IOT's motion to present expert testimony.

On March 10, 1999, this court denied IOT's request to present expert testimony on the issue of whether the RFP could be interpreted to include a burn-in requirement. The court determined that IOT's request did not fit within the established exceptions to record review identified in *Cubic*. Although *Cubic* recognizes that extra-record evidence may be used to supplement the record when agency action is not fully explained, this does not extend to opinion testimony on contract interpretation, which is a matter of law.

5. Assuming, *arguendo,* that IOT were to prevail, this would not mean that the Army must disregard Honeywell's proposal and make award to IOT. As IOT agreed at oral argument, the sealed bid concept of "responsiveness" generally does not apply to negotiated procurements. *See Gardiner, Kamya & Assocs., P.C.,* Comp. Gen. B–258400, 95–1 CPD ¶ 191. If an offeror submits an offer that deviates from the requirements of the RFP, the government need not award to that offeror but *can* revise the RFP to allow other offerors to submit revised offers that include the same deviation. John Cibinic, Jr. and Ralph C. Nash, Jr. *Formation of Government Contracts* 781 (3d ed.1998).

tract to Honeywell. In addition, the court agrees with the defendant and defendant-intervenor that any ambiguity in the RFP must be construed against IOT.

### A. The RFP Does Not Unambiguously Require Burn–In Testing for All Units

■ Whether the RFP required burn-in testing for all repaired and retrofitted LRUs is a question of law. The court's examination begins with the plain language of the contract. See Textron Defense Sys. v. Widnall, 143 F.3d 1465, 1468 (Fed.Cir.1998). If the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the contract is controlling. See Goldsmith v. United States, 42 Fed.Cl. 664, 668 (1999). In this connection, the court must interpret the contract "as a whole" in order to "effectuate its spirit and purpose." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed.Cir.1991) (quoting Arizona v. United States, 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978)).

Here, Attachment 01, paragraph 2.5 of the RFP (which references paragraph 6 of Appendix 1) established a specific acceptance testing procedure for all repaired and retrofitted LRUs that did not on its face include a burn-in test.[6] Mr. Chi, Chairman of the Technical Review Committee, confirmed this reading of the RFP in his deposition.[7] Defendant and defendant-intervenor contend that this should end the court's inquiry. IOT argues in response, however, that other RFP provisions demonstrate that burn-in testing was required for all repaired and retrofitted LRUs. The court will examine each of those provisions in turn.

IOT relies primarily on Table I of the RFP and the referenced drawings to support its claim that testing was required for all units. Table I stated that "[u]nless otherwise specified in the [RFP], the following drawings and all associated drawings shall be used as references." As noted above, Table I identified Drawing A3060585, which, in turn, refer-

enced Drawing A3060587, which provided that all units must be subjected to production run-in and burn-in/debugging testing. IOT reads the statement in Table I to mean that the drawings referenced in Table I establish substantive testing requirements. Therefore, according to IOT, Drawing A3060587 by its plain terms established that burn-in testing is required for all repaired and retrofitted LRUs.

■ The court recognizes that where an RFP expressly incorporates drawings by reference into a contract the drawings may establish binding requirements. See Science Pump Corp., B–255803, 94–1 CPD ¶ 227 (where RFP clearly incorporated by reference a standard FAR inspection clause, contractor required to follow FAR inspection procedure). However, where, as here, there are specific acceptance testing requirements for all LRUs set forth in the text of the RFP (Attachment 01, paragraph 2.5 and Appendix 1, paragraph 6), and that specific RFP testing provision does not cross-reference any attached drawings, the court cannot simply presume that the testing provisions identified in the drawings establish binding requirements. See Telectro–Mek, Inc., B–190653, 79–1 CPD ¶ 263 (drawing reference in a contract amendment was not considered to be a contract requirement where the RFP unambiguously provided the controlling specification).

In this connection, the absence of a cross-reference to the Table I drawings in Attachment 01, paragraph 2.5 of the RFP and Appendix 1, paragraph 6 stands in marked contrast to several other paragraphs in the RFP that expressly referred the bidder to the Table I drawings for guidance. In each of these below-identified provisions there is an express reference to the Table I drawings:

Paragraph 2.3 Dimensions ("[o]utline dimensions shall be as specified in drawings in Table I"); Paragraph 2.4—Indicator Display ("[t]he layout of the indicator shall be as specified in drawings in Table I"); Paragraph 2.6—Controls ("[c]ontrol knobs

---

6. Specifically, as noted above, paragraph 6 required testing at an ambient temperature of 75° ± 15° F with humidity up to 95 percent and normal pressure.

7. See supra note 4.

shall have a clutch mechanism capable of slipping per drawing specified in Table I"); Paragraph 2.7—Zero Adjusts ("zero adjust access holes (see Table I) shall be retained"); Paragraph 2.9—Marking ("[a]ll units shall be marked with nameplate data consistent with the guidance contained within the individual units production drawing set (see Table I)"); and Paragraph 2.10—Workmanship ("[t]he equipment shall be repaired and retrofitted in accordance with the guidance and information contained in the equipment drawings (see Table I)").[8]

Where, as here, the testing provision does not cross-reference the drawings, the court does not read the burn-in test identified on one of the drawings as a substantive testing requirement in the contract. Indeed, even IOT recognizes that the testing references on the drawing need to be read in context. As noted above, Drawing A3060587, in addition to specifying burn-in testing, also called for a production run-in test to be conducted on all units. Yet IOT does not read the drawing to mandate production run-in testing on the grounds that production run-in testing applies only to *new* LRUs—not repaired and retrofitted units. IOT's selective reading of the drawing exemplifies why the drawings should only be used where they are expressly referenced in the RFP and its attachments. Because the court finds that the RFP contained a specific acceptance testing provision and did not cross-reference the Table 1 drawings, the drawings do not create an unambiguous requirement for burn-in testing as argued by IOT.

▪ IOT next argues, without regard to Table I, that a requirement for burn-in testing for all repaired and retrofitted LRUs also is established by the burn-in procedure required for first articles under the "FAT" provision. IOT argues that under Appendix

2, paragraph 12, "[a]ll first articles shall be repaired and retrofitted at the same location at which all other inducted units will be repaired and retrofitted, using the same parts, materials, and repair/retrofit processes to be employed for subsequent repair and retrofit efforts." IOT contends that "testing" is a repair/retrofit "process," and thus, consistent with the FAT provision, all LRUs should be subjected to burn-in testing.

The court disagrees. As discussed above, the RFP stated with respect to the FAT units that, "[p]rior to being subjected to mechanical, visual, and electrical inspections specified in Appendix 1, the first article shall be subjected to a failure-free 24 hour minimum burn-in ...." The above-noted language in FAT makes plain that: (1) there is no burn-in requirement specified in Appendix 1; and (2) the burn-in procedure is to be used only for first article units. Because the burn-in test is unique to FAT, there is no merit to IOT's argument that *all* the repaired and retrofitted LRUs also must be subject to such a test. Moreover, the Army ultimately decided to waive first article burn-in testing for both Honeywell and IOT. When the Army waived FAT, the requirement for burn-in testing was taken out of the contract entirely. Appendix 2, paragraph 11 stated that if the First Article approval testing is waived, "the First Article requirement will be deleted from the contract ..." In such circumstances, IOT's reliance on the FAT provision to show that the Army intended for all subsequently repaired and retrofitted LRUs to be subject to burn-in testing based on the FAT provision is misplaced. Accordingly, the court finds that the FAT provision does not independently establish a burn-in requirement in the RFP at issue.

▪ Finally, IOT argues that an unambiguous requirement for burn-in testing is evident from the contract provision requiring a

---

**8.** IOT argues that because the "Workmanship" provision states that equipment is to be "repaired and retrofitted" in accordance with Table I and the drawings therein, this proves that burn-in testing is required. Read carefully, however, this section of the RFP does not establish that the Table I drawings were intended to be incorporated into the contract with respect to *acceptance* testing. As noted above, Appendix 1, paragraph

2.10 of the RFP does not require "testing" in conformity with the drawings in Table I. Rather, paragraph 2.10 merely states that the units shall be "repaired and retrofitted" in accordance with the information in Table I. Considering that the RFP contained a separate provision for "testing" LRUs, IOTs contention is undercut by the plain words of the RFP.

Quality Assurance Plan ("QA Plan"). Specifically, paragraph L–7(2)(a)(3) of the RFP stated that the offerors should submit its QA procedures for, among other things, the "burning-in of *new* selective parts." (emphasis added). By its plain terms, the QA provision refers to the use of burn-in for *new* selective parts, not all the repaired and retrofitted LRUs. Thus, this section does not support IOT's argument that the RFP required burn-in testing for *all* repaired and retrofitted LRUs. *See Goldsmith v. United States,* 42 Fed.Cl. 664, 668 (1999) ("When the contract language is unambiguous, the court's inquiry is at an end and the plain language of the contract is controlling.").

Taken as a whole, the RFP cannot fairly be read to unequivocally require burn-in testing for all repaired and retrofitted LRUs. For all of the above stated reasons, the court concludes that the RFP did not establish a clear requirement for burn-in testing for all repaired and retrofitted LRUs.[9] Accordingly, this court will not set aside the Army's award to Honeywell on the ground that Honeywell's offer did not meet the testing requirements mandated by the RFP.

### B. *Ambiguous Contract Specifications*

■ IOT argues in the alternative that if the RFP did not unambiguously call for burn-in testing, the RFP language is latently ambiguous[10] and should be construed to require burn-in testing under the doctrine of *contra proferentum.* Under this doctrine, "if a drawing or specification is ambiguous and the contractor follows an interpretation that is reasonable, this interpretation will prevail over one advanced by the Government, even though the Government's interpretation may be a more reasonable one since the Government drafted the contract." *United Pac. Ins. Co. v. United States,* 204 Ct.Cl. 686, 695, 938, 497 F.2d 1402, 1407 (1974). An exception to the general rule of *contra proferentum,* however, applies if the ambiguity is "patent." *Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1474 (Fed.Cir.1997) (quoting *Fortec Constructors v. United States,* 760 F.2d 1288, 1291 (Fed.Cir.1985)). A patent ambiguity is one that is "obvious," "gross," "glaring," or "substantial." *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 997 (Fed.Cir. 1996). As this court recently stated in *Nielsen–Dillingham Builders, J.V. v. United States:*

> The law teaches that a contract is subject to a patent ambiguity if it contains facially inconsistent provisions that would place the reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties.

43 Fed.Cl. 5, 11 (1999).

■ This duty of inquiry requires the contractor to ask about the correct meaning of the contract *prior* to submitting a bid. *See id.* at 10; *Newsom v. United States,* 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982). If the offeror fails to ask, the contract will be con-

---

9. In support of its contention that burn-in testing was required in the RFP, IOT argues that burn-in testing on all repaired and retrofitted LRUs makes sound policy sense. "[T]he LRUs at issue in this procurement are critical flight safety items that tell an aviator how high he is off of the ground.... If the height indicator is off or an aviator wearing night vision goggles cannot read the indicators, the aircraft may crash resulting in serious injury or the death of the crew."

Although this court appreciates the sincerity of IOT's position, this court's role is not to second guess what the Army has determined to be its needs. As the GAO stated in *AT & T Corp.,* Comp. Gen. B–270841, 96–1 CPD ¶ 237:

> [t]he governing statutes and regulations allow contracting agencies broad discretion in determining their minimum needs and the appropriate method for accommodating them.... [W]ithout a showing that competition is restricted, agencies are permitted to determine how best to accommodate their needs, and we will not substitute our judgment for that of the agency.

(citations omitted); *see also Mine Safety Appliances Co.,* B–242379.2, B–242379.2, 91–2 CPD ¶ 506.

10. An ambiguity is "latent" if it is a "hidden or concealed defect [that is] not apparent on the face of the document," and "could not be discovered by reasonable or customary care." *Analytical & Research Tech. Inc. v. United States,* 39 Fed.Cl. 34, 36 (1997) (quoting *Diggins Equip. Corp. v. United States,* 17 Cl.Ct. 358, 360 (1989)). A latent ambiguity generally becomes evident, when, "considered in light of the objective circumstances, two conflicting interpretations appear reasonable." *Cray Research, Inc. v. United States,* 41 Fed.Cl. 427, 435 (1998).

strued against it. *Nielsen–Dillingham,* 43 Fed.Cl. at 10; *Newsom,* 676 F.2d at 650.

 Here, the RFP permits two potentially inconsistent readings.[11] On the one hand, the testing provisions in the text of the RFP did not require burn-in testing for all LRUs but only for first articles. On the other hand, referenced Drawing A3060587 expressly identified a burn-in testing requirement for all units without any qualification. These two facially inconsistent requirements create an ambiguity. Because the inconsistency is plain from the face of the solicitation, however, the ambiguity is "patent." This triggered IOT's obligation to inquire.[12] IOT failed to make such an inquiry. As a result, this court will not construe the RFP as requiring burn-in testing for all repaired and retrofitted LRUs.[13] Accordingly, to the extent the RFP was ambiguous it does not provide a basis for overturning the Army's award decision.

## CONCLUSION

The court concludes that the Army's procurement decision was not arbitrary, capricious, or otherwise not in accordance with law. Accordingly, IOT's motion for summary judgment and permanent injunction is **DENIED** and judgment for the defendant and defendant-intervenor is **GRANTED.** The

---

**11.** While the issue is close, the court does not find IOT's confusion unreasonable.

**12.** The purpose of a negotiated procurement is to "permit agencies to use flexible procedures" and to have discussions that "may result in modifications of proposals by offerors to correct deficiencies or to enhance their offers." John Cibinic, Jr. and Ralph C. Nash, Jr., Formation of Government Contracts, 709–10 (3d ed.1998). Under this type of procurement, plaintiff had ample opportunity in discussions to clarify any questions it may have had about burn-in testing.

**13.** Defendant and defendant-intervenor argue that even if this court construes the RFP to be latently ambiguous, IOT's protest must still be rejected on the grounds that IOT's price, even without the burn-in requirement, was $6 million more than Honeywell's. According to defendant and defendant-intervenor, this excess in price means that IOT cannot show that it would have had a "reasonable likelihood" of being awarded the contract and therefore it was not prejudiced by any alleged ambiguity. *See Data General*

clerk is directed to enter judgment accordingly. Each party shall bear their own costs.

*Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir. 1996); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996) (plaintiff must show not only a significant error in the procurement process, but also that the error was prejudicial). For the reasons set forth above, the court concludes that the RFP specifications were not latently ambiguous, and thus Honeywell's proposal met all applicable contract requirements. Therefore, the court declines to reach defendant and defendant-intervenor's argument regarding lack of prejudice. The court notes, however, that even if this court reached the prejudice argument, a differential in price alone is not necessarily enough to conclude that an offeror would not have had a reasonable likelihood of award. *See Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365 (Fed.Cir.1999) (a bid protestor may be prejudiced if the government accepts an offer that does not conform to certain specifications, even if there is a "colossal" price differential).