GULF GROUP, INC., Plaintiff,

v.

The UNITED STATES, Defendant,

v.

ABC Landclearing and Development, Inc./ Tri–State Design & Construction Co., Inc., A Joint Venture, Intervenor.

No. 02–459C.

United States Court of Federal Claims.

Filed under seal: Jan. 14, 2003.

Published: May 9, 2003.[1]

---

1. This opinion was issued under seal on January 14, 2003. The parties were given an opportunity to propose redactions; however, no such redactions were suggested and, therefore, the opinion is now published in its original form.

Daniel Te Young, Smith, Currie & Hancock, LLP, Tallahassee, Florida, for plaintiff.

Domenique Kirchner, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Robert D. McCullum, Jr., for defendant.

Jeffrey A. Less, Bazelon Less Feldman, Philadelphia, Pennsylvania, and David D. Gilliss, Niles, Barton & Wilmer, Baltimore, Maryland, for intervenor.

## OPINION

ALLEGRA, Judge.

This bid protest action is before the court on the parties' cross-motions for judgment on the administrative record. This is a post-award challenge to the April 25, 2002, award by the United States Army Corps of Engineers (the Corps) of a fixed-price contract to ABC Landclearing and Development, Inc./ Tri–State Design & Construction Co., Inc., a joint venture (ABC). Gulf Group, Inc. (Gulf), a Florida corporation, sought the same contract and now seeks injunctive relief setting aside the award to ABC and awarding it the contract, as well as bid preparation costs and other relief. After careful consideration of the briefs filed by the parties, the oral argument, and for the reasons discussed below, the court **DENIES** plaintiff's motion for judgment on the administrative record and instead **GRANTS** defendant's cross-motion.

## I. BACKGROUND

On March 14, 2000, the Corps issued Solicitation No. DACW01–00–R–0030 (the Solicitation), entitled "Indefinite Delivery/Indefinite Quantity (ID/IQ) Contract for Rental of Construction Equipment with Operators for Disposal Area Management and Levee Main-

tenance, Gulf Intracoastal Waterway, Apalachicola, Chattahoochee, Flint River System, Alabama, Florida, and Georgia." The Solicitation contemplated the award of a fixed-price contract for a base year, with four option years. It was advertised as a competitive procurement under the Small Business Administration's (SBA) 8(a) Program, restricted to 8(a) firms in SBA geographic Region IV.

Under the Solicitation's description of work, the desired undertaking was generally described to consist of "furnishing rental equipment, operators, supplies, materials, labor, transportation, fuel, etc. to perform maintenance and rehabilitation of approximately eighteen (18) dredge material disposal sites and levee maintenance along fourteen (14) miles of levee." Regarding the disposal sites, the work was to consist of "raising dikes, construction of new areas, grading material, installing weirs and ditching." The levee maintenance work was to include "mowing, fertilizing, ditching, vegetation control, excavation, grading and filling to maintain levee crown." Finally, the required dredging was to include "removing shoaled material and placement on adjacent beach."[2]

In crafting their proposals, potential offerors were required to "read the contract as a whole" and "identify all key work to be self-performed, and all firms being considered for performance of the key work features." Under the Solicitation, such proposals were to be evaluated on the basis of price and performance, with performance evaluated under two equal subfactors—management capability/effectiveness and past performance. The award was to be made to the offeror whose proposal represented the best value based on a performance/price tradeoff in which the performance factor was "significantly more important than cost or price."[3]

To facilitate evaluation of the performance factor, the Solicitation directed offerors to list prior contracts demonstrating "a record of satisfactory, recent, related experience" in the type of construction described in the Solicitation, "including the key work features" described in the Solicitation. Along these lines, the prime contractor was required to "demonstrate recent, related experience," and, in so doing, "[p]rovide [a] reference list identifying construction projects within the last five years, in which the prime contractor has been involved which are similar to this project in scope and magnitude." In slightly different fashion, another provision in the Solicitation directed the prime contractor to "provide examples of projects demonstrating experience within the last five years, in each of the key work features identified in the organization narrative, if to be

---

2. More specifically, the statement of work described these tasks, as follows:

    2.1 *DISPOSAL AREA MAINTENANCE:* The work to be performed consists of the maintenance and rehabilitation of dredge disposal sites located along the waterways shown below. Work shall consist of raising dikes around existing areas, construction of new areas, leveling and stacking existing materials, installing weirs and outfall piping, and maintenance of or construction of ditching associated with these disposal areas. Some of these disposal sites are in remote areas and not accessible by land.

       \*    \*    \*    \*    \*    \*

    2.2 *LEVEE MAINTENANCE:* The levee maintenance work required will consist of mowing, fertilizing, and cutting back encroaching vegetation and overhanging limbs along the levee, vegetation control and trash cage maintenance around thirteen (13) drop inlet structures, excavation and replacement of two (2) complete structure outfall pipe, haul and fill *operations to maintain the levee crown*

at a uniform graded elevation, maintain all ditching associated with drop inlet structures, and raise existing or construct new ring dikes around eroded areas of the high bank section.

      \*    \*    \*    \*    \*    \*

    2.3 *DREDGING:* The work to be performed with rental equipment is located on the West side of Old Pass Lagoon, Okaloosa Co., Destin, FL and consist of removing shoaling from Noriego Point. The contractor's equipment may be required to operate in salt water.

3. By way of explanation, the section of the Solicitation explaining the performance-price tradeoff stated that "[i]f the lowest priced evaluated offer is judged to have an exceptional performance risk rating, that offer represents the best value for the Government and the evaluation process stops at this point." This provision continued: "[t]he Government reserves the right to award a contract to other than the lowest priced offer if that offeror is judged to have a performance risk rating of 'very good' or lower."

self-performed."[4]

Offerors were advised that the Corps would assign each proposal an overall performance rating, chosen among the following: exceptional/high confidence; very good/significant confidence; satisfactory/confidence; neutral/unknown confidence; marginal/little confidence; and unsatisfactory/no confidence. The confidence levels referred to the Corps' level of confidence that the offeror would perform the work described in the Solicitation. Under the Solicitation, a "neutral/unknown confidence" rating was to be given where an offeror had "no relevant performance history." According to the Solicitation, "a neutral rating could be considered less favorable than a favorable past performance rating."

The bid opening date was on June 8, 2000, by which date seven offerors, including Gulf and ABC (the incumbent), had submitted proposals. In July 2000, the Corps Source Selection Evaluation Board (SSEB) met and preliminarily reviewed the technical proposals submitted by the offerors. The SSEB found several deficiencies in Gulf's proposal, among them Gulf's failure to identify subcontractors or field work personnel, including operators. The SSEB did not identify any deficiencies in ABC's proposal, finding that it reflected "a good on-site management team and organization staff with the capability to operate on multiple work sites during the same period of time." The SSEB's initial overall ratings were "satisfactory" for Gulf and "very good" for ABC.

After further evaluation, five offerors' proposals were included in the competitive range, including those of Gulf and ABC. The SSEB recommended that a price review of these proposals be conducted and that clarifications and discussions be conducted with the offerors in the competitive range.[5] The Corps subsequently held those discussions. As part of those discussions, by letter dated March 16, 2001, the Corps asked Gulf, *inter alia*, to address its failure to include a list of its subcontractors in its proposal. That same day, Gulf faxed the Corps a response to this letter, but therein neither identified its subcontractors nor the circumstances under which they would operate.

On March 23, 2001, the Corps requested that final proposals be received by March 29, 2001. Gulf and ABC both submitted final proposals by that date. In the past performance section of its proposal, Gulf identified five projects: (i) the Storm Water Treatment Area 2 in Palm Beach County, Florida, where Gulf constructed levees and storm water control systems as a subcontractor to Bergeron Land Development; (ii) the removal and replacement of several sewer lift stations for MacDill Air Force Base, Florida; (iii) the construction of 14 miles of base road through the Apalach National Forest in Liberty County, Florida, for the Federal Highway Administration; (iv) road maintenance in the Apalachicola National Forest in Liberty County, Florida, for the Department of Agriculture; and (v) the construction of a training area for Army demolitions at Eglin Air Force Base, Florida. Gulf did not identify any of these projects as involving ID/IQ contracts. The customer questionnaires submitted with respect to these projects reflected ratings ranging from "very good" to "satisfactory."

With regard to the performance factor, the Corps found that Gulf had considerable construction experience and that its proposal indicated experience in earth construction and heavy equipment. However, the Corps found that only one of the projects listed included some storm water levee construction that bore resemblance to some of the levee construction work that would be ordered against this contract and that Gulf's role in that construction was only as a sub-

---

4. Another Solicitation provision describing the evaluation of proposals defined "recent experience" as those completed within three, rather than five, years of the proposal receipt date. Plaintiff alleges that this provision conflicted with the provisions discussed in the text—however, it apparently failed to raise this patent ambiguity during the procurement.

5. There is no record support for Gulf's assertion that only one eligible 8(a) contractor met the terms of the Solicitation. In fact, the Solicitation required that all offerors be 8(a) certified and, as noted, it appears that five eligible 8(a) offerors submitted proposals that were found to be within the competitive range.

contractor. The Corps further found that Gulf had presented no information to show that it had experience on ID/IQ equipment rental task order type contracts or "any 'hands-on' work experience in dredge disposal area management projects," twin findings that gave the Corps "a lower degree of confidence" and "serious reservations about [Gulf's] ability to perform" the contract. Because the Corps considered Gulf's management capability/effectiveness to be satisfactory and the relevance of its five past performance references to be limited, the Corps gave Gulf an overall "satisfactory/ confidence" rating for the performance factor. By comparison, with respect to the performance factor, ABC received a "very good" overall rating. This rating took into account not only ABC's "exceptional" rating as the incumbent for the contract, upon which it had worked since 1997, but also an "exceptional" and two "very good" ratings it received on its other customer questionnaires.

Overall, the SSEB reached the following final evaluation results:

| Offeror | Performance Rating | Price |
|---------|-------------------|-------|
| Gulf | Satisfactory | $12,124,250 |
| ABC | Very Good | $12,711,375 |
| Offeror 3 | Very Good | $17,663,175 |
| Offeror 4 | Satisfactory | $17,245,157 |
| Offeror 5 | Very Good | $17,097,001 |

According to the SSEB, Gulf's final performance rating did not change from its initial rating of "satisfactory" because, among other things, its experience did not stack up well with the offerors who received "very good" ratings and there were lingering doubts as to whether Gulf's proposal fully anticipated the work to be performed under the contract.[6]

By memorandum dated April 5, 2001, the SSEB recommended award of the contract to ABC. As to ABC, this memorandum notes that "ABC has considerable recent experi-

ence in earth moving construction, which is very relevant to this specific contract effort," indicating further that "ABC is the incumbent contractor ... and has performed all contract work in an exemplary manner." Noting that "ABC's proposal appears written specifically for this type of ID/IQ equipment rental contract," the SSEB memorandum concluded that its proposal "strongly demonstrates that they should continue to be highly successful in performing all contract work requirements." By contrast, this same memorandum indicated, as to Gulf, that–

> Although Gulf showed limited experience in earthwork activities such as road maintenance and levee construction, the SSEB expressed serious reservations about their ability to perform specific construction activities associated with this dredge disposal area maintenance contract. This is due to the fact that their proposal did not demonstrate explicitly any "hands-on" work experience in dredge disposal area management projects.

Emphasizing this point, the memorandum continued—"The contractor's proposal did not reveal any experience in an equipment rental task order type contract, performing dredged material disposal area maintenance operations. The contractor's resumes of their on-site management team displayed a wide range of construction experience, but again their experience was lacking as it relates to the preponderance of specific work to be performed under this ID/IQ equipment rental contract."

The Corps contracting officer determined that the recommendations of the SSEB "conform[ed] to the evaluation factors" and concurred in its finding that "although Gulf Group offered the lowest overall evaluated price, with a satisfactory performance rating, ABC's past performance proposal illustrated considerably more relevant past performance and experience as it relates to the instant contract requirements." On April 25, 2002, the Corps awarded the contract to ABC.

---

6. Gulf contends that the Corps "downgraded" its overall rating as a result of its conclusion that Gulf failed to present previous experience on ID/IQ equipment rental task order type contracts involving the performance of dredge material disposal area maintenance. However, the record reveals that Gulf was initially rated as satisfactory and again rated such after the Corps reviewed the past performance questionnaires submitted by Gulf's customers.

Gulf filed a protest with the GAO, which was denied. Gulf then filed suit in this court on May 6, 2002. On June 5, 2002, this court granted ABC's motion to intervene in this action. Subsequently, the parties filed cross-motions for judgment on the administrative record.

## II. DISCUSSION

### A. Legal Background

■ In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1994). *See also* 28 U.S.C. § 1491(b)(4) (1994 & Supp. V 2000). Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated that "[t]o make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed.Cir. 2000).[7] Accordingly, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)). Indeed, a protestor's burden is particularly great where, as here, the procurement is a "best-value" procurement[8] under 48 C.F.R. § 15.605(c)

---

7. By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). *See also Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

8. The Federal Acquisition Regulation (FAR) defines "best value" as "the expected outcome of

(2001).[9] *See Mangi Envtl. Group, Inc. v. United States*, 47 Fed.Cl. 10, 15 (2000); *see also TRW, Inc. v. Unisys Corp.*, 98 F.3d 1325, 1327 (Fed.Cir.1996); *LaBarge Prods., Inc. v. West*, 46 F.3d 1547, 1555 (Fed.Cir. 1995) (citing *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980)).

■ Generally, in bid protest cases, it is the burden of the aggrieved bidder to demonstrate that the challenged agency decision is either irrational or involved a clear prejudicial violation of applicable statutes and regulations. *See 126 Northpoint Plaza Ltd. Partnership v. United States*, 34 Fed.Cl. 105, 107 (1995); *see also ManTech Telecomms. & Info. Sys. Corp. v. United States*, 49 Fed.Cl. 57, 64 (2001) (and cases cited therein), *aff'd* (per curiam), 30 Fed.Appx. 995 (Fed.Cir. 2002); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed.Cl. 560, 566 (2000). Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). Finally, because injunctive relief is so drastic in nature, the plaintiff must demonstrate that its right to such relief is clear. *See ManTech*, 49 Fed.Cl. at 64.

### B. Was the Corps' contract award decision arbitrary, capricious, or otherwise not in accordance with the law.

Against this backdrop, Gulf advances three functionally related arguments in seeking to overturn the award to ABC. The court will consider these assertions *seriatim*.[10]

---

an acquisition that, in the Government's estimation, provides the greatest overall benefit in response to the requirement." 48 C.F.R. § 2.101 (2001).

9. All references herein to the Code of Federal Regulations are to the 2001 version, unless otherwise noted.

10. In its complaint, Gulf raised a fourth argument that it apparently has since abandoned, *to wit*, that the Corp violated the SBA's regulations in announcing that it had awarded the contract to ABC prior to receiving notice from the SBA that ABC was an eligible 8(a) firm.

## 1. Undisclosed Evaluation Factor

Gulf initially asserts that the evaluation of its past performance was flawed because the SSEB improperly applied an undisclosed evaluation factor. Specifically, it contends that it was improper for the SSEB to consider and emphasize Gulf's lack of demonstrated experience in ID/IQ task order contracts covering disposal area maintenance. Gulf claims that had it known of this specific factor, it would have submitted additional examples of its past performance in dredging and ID/IQ contracts.

■ We begin with common ground. It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation. This requirement is firmly rooted in the Competition in Contracting Act (CICA) and the FAR, both of which indicate that an agency shall evaluate competitive proposals and assess their qualities solely on the factors and subfactors specified in the solicitation. *See* 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000); FAR § 15.305(a). It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria when evaluating proposals, *Acra, Inc. v. United States*, 44 Fed.Cl. 288, 293 (1999), and must even disclose the factors' relative importance, *Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 230 (1992). *See also Cube Corp. v. United States*, 46 Fed.Cl. 368, 377 (2000); *Dubinsky v. United States*, 43 Fed.Cl. 243, 266 (1999). That said, an agency still has "great discretion in determining the scope of an evaluation factor." *Forestry Surveys and Data v. United States*, 44 Fed.Cl. 493, 499 (1999) (citing John Cibinic Jr. & Ralph C. Nash Jr., Formation of Government Contracts 830 (3rd ed.1998)). Within this discretion, an agency "can give more weight to one contract over another if it is more relevant to an offeror's future performance on the solicited contract."

*Id.; see also Maintenance Engineers v. United States*, 50 Fed.Cl. 399, 415 (2001).

■ Hewing to these precepts, in a case such as this, a protester must show that: (i) the government used a different basis in evaluating the proposals than was disclosed; and (ii) the protester was prejudiced as a result—that it had a substantial chance to receive the contract award but for that error.[11] Gulf has failed on both counts.

■ First, the Solicitation clearly placed Gulf on notice that the requested proposals related to an ID/IQ task order contract that covered disposal area management. The indications of this are abundant and hardly subtle, beginning with the title emblazoned on the front of the Solicitation that, in bold, capital letters, refers to both requirements. In addition, the Solicitation's description of work explicitly indicates that the contract is to be an ID/IQ contract "to perform maintenance and rehabilitation of approximately eighteen (18) dredge material disposal sites and levee maintenance along fourteen (14) miles of levee." Similar requirements were described in the statement of work, which detailed the nature of the dredging and maintenance of multiple dredge material disposal areas to be initiated on an ID/IQ task order basis. The Solicitation also plainly required offerors to list prior contracts demonstrating "a record of satisfactory, recent, related experience" in the type of construction described therein, emphasizing further that the construction projects cited should be "similar to this project in scope and magnitude." Yet another provision required offerors to identify and demonstrate that their key personnel had "satisfactory experience in similar type of work." All these requirements, read together, made amply clear that the Corps intended to evaluate experience based, in part, on the similarity of that experience to the work envisioned by the contract.[12]

---

11. *See Bean Stuyvesant*, 48 Fed.Cl. 303, 321 (2000) ("this court may grant an offeror relief if the offeror establishes that the agency evaluated the proposal on a basis different than that announced in the solicitation and that the offeror was prejudiced as a result"); *see also Dubinsky*, 43 Fed.Cl. at 266; *Hydro Eng'g, Inc. v. United States*, 37 Fed.Cl. 448, 471 (1997); *CACI Field*

*Servs., Inc. v. United States*, 13 Cl.Ct. 718, 728 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988).

12. For its part, plaintiff leans heavily on *Lloyd H. Kessler, Inc.*, 2000 CPD ¶ 96, 2000 WL 745317 (2000). That case, however, is clearly inapposite. There, the agency considered a single subfactor, "bioengineered slope protection"

■ Even if the contract had been less explicit, the Corps still would have been entitled to consider generically an offeror's experience in performing the specific tasks that were the subject of the procurement. *See, e.g. Maintenance Engineers,* 50 Fed.Cl. at 416 (holding that subfactor in solicitation for landscaping indicating agency would review "[s]pecific grounds experience and past performance" was adequate to alert offerors that experience with similar projects would lead to higher rating); *Bean Stuyvesant,* 48 Fed. Cl. at 321 (holding that, although the solicitation's "instructions to bidders" did not specifically refer to "hardbottom protection" as a factor, an examination of the solicitation as a whole, including the Description of Work and contract drawings, revealed that "hardbottom protection" was a factor and plaintiff was therefore on notice that it was a factor). Indeed, it is settled that "a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 45 (1997); *see also Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 309 (2002); *Bean Stuyvesant v. United States,* 48 Fed.Cl. at 321; *T & S Products, Inc. v. United States,* 48 Fed.Cl. 100, 105 (2000). Given the clarity of the Solicitation, invoking these salvific principles here is perhaps occasion to be flagged for a 15–yard "piling on" penalty. Doing so, however, removes the last scintilla of doubt that the Corps, in evaluating plaintiff's experience, did not improperly deviate from the Solicitation's evaluation factors.

■ To cinch matters, Gulf has failed to show that any prejudice resulted from the alleged error in the procurement process, *i.e.,* there was a reasonable likelihood that

Gulf would have been awarded the contract had it not been for the error. *See Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed. Cir.1996); *Data Gen. Corp.,* 78 F.3d at 1562. In particular, Gulf's president, Mr. Hobbs, did not detail any of Gulf's past experience in dredging work in his affidavit, leaving the distinct impression that Gulf lacked such experience. Without such experience, it is exceedingly doubtful that Gulf would have been awarded the contract and equally doubtful that Gulf suffered any prejudice from the alleged error in the procurement process. This result is all the more apparent given that ABC, as incumbent, had experience similar to the solicited work, which experience caused the Corps to rate its proposal more highly. That fact assuredly did not render the procurement improper—while an agency may not unduly tip the scales in favor of an incumbent, it certainly may weigh the competitive advantages offered by that incumbent via its relevant experience and performance with the contract subject matter. *See Computer Sciences Corp.,* 51 Fed.Cl. at 311; *WinStar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 763 (1998).[13] The short of it is that in government contracts, even as in politics, there are often some earned benefits of incumbency—ones to which an agency need not turn a blind eye in the award calculus. Plaintiff should not be heard to complain otherwise.

#### 2. Use of Neutral Rating

■ Continuing its attack, Gulf next challenges the evaluation of its past performance as "satisfactory," asserting that its lack of dredge disposal area experience instead should have led it to receive a "neutral" rating. Plaintiff asseverates that had this

---

to be key, even though the term appeared no where in the solicitation. By comparison, here, experience with ID/IQ contracts in the context of dredge material disposal sites was clearly revealed in the Solicitation and the impact of that factor was not weighted by the agency, but simply proved to be dispositive in the case of plaintiff. In fact, other offerors who lacked that experience still managed to receive "very good" performance ratings.

**13.** *See also Madison Servs., Inc.,* 98–1 CPD ¶ 113, 1998 WL 179961 (1998); *MCA Research Corp.,*

97–2 CPD ¶ 33, 1997 WL 422232 (1997); *Versar, Inc.,* 94–1 CPD ¶ 230, 1994 WL 120013 (1994) ("an offeror's competitive advantage gained through incumbency is generally not an unfair advantage that must be eliminated."); *Bara–King Photographics, Inc.,* 93–2 CPD ¶ 169, 1993 WL 376481 (1993) ("It is not unusual for an offeror to enjoy an advantage in competing for a government contract by reason of incumbency, and there is no requirement for agencies to equalize or discount such advantage").

happened, it would have been entitled to an overall performance rating of "very good." In this regard, the FAR provides that offerors with no relevant past performance history or unavailable history may not be treated favorably or unfavorably. FAR § 15.305(a)(2)(iv). *See JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 660 (2002). Consistent with this provision, under the Solicitation, a "neutral/unknown confidence" rating was to be given where an offeror had "no relevant performance history."

To begin with, this court is "mindful that '[t]he determination of the relative merits of proposals is the responsibility of the procuring agency since it must bear the burden of any difficulties incurred by reason of a defective evaluation.'" *JWK Int'l,* 52 Fed.Cl. at 659 (quoting *Biological Monitoring, Inc.,* 83–1 CPD ¶ 395 at 2, 1983 WL 26711 (1983)). The Corps did not assign Gulf a "neutral" rating because it found that Gulf had relevant experience, including directly correlative experience with respect to several key tasks identified in the Solicitation. Thus, for example, the Corps found that Gulf was a "qualified contractor" which had considerable construction experience, including familiarity with earth construction and the use of heavy equipment. The Corps also found that one of the projects listed included storm water levee construction which bore resemblance to some of the levee construction work that would be ordered against this contract. Accordingly, while plaintiff's relative lack of experience led the Corps to conclude that it had a lower degree of confidence in Gulf than ABC, that finding did not oblige the Corps to give Gulf a neutral evaluation on past performance. The satisfactory rating plaintiff instead received thus was not arbitrary, capricious or otherwise not in accordance with law.[14]

At all events, since the Solicitation provided that a neutral rating could be considered less favorable than a favorable past performance rating, it appears that plaintiff was not prejudiced by receiving a satisfactory rating. Contrary to plaintiff's importunings, the provision in the Solicitation which permitted such relative treatment of a "neutral" rating is not inconsistent with the FAR. *See, e.g., West Coast Unlimited,* 99–2 CPD ¶ 40, 1999 WL 644444 (1999) ("an agency may properly in its cost/technical tradeoff analysis consider the difference between a higher-priced offeror with a good performance rating over a lower-priced offeror with a neutral performance rating"); *Phillips Indus., Inc.,* 98–2 CPD ¶ 74, 1998 WL 639099 (1998) (contracting officer's decision to award to the slightly higher-priced firm with an established excellent performance history, rather than a lower-priced vendor with no performance history with the agency, was permissible and reasonable). Indeed, even if plaintiff had received a higher rating for past performance, it received a "satisfactory" for the management capability subfactor, leaving it with ratings that still were below ABC's across-the-board "very good" ratings on the performance subfactors.

### 3. Illegal Sole Source Contract

■ Finally, plaintiff argues that the Corps' actions violated various "full and open competition" provisions, *see, e.g.,* 41 U.S.C. § 253(a)(1) (2000), by effectively turning the Solicitation into one for a sole-source contract. It contends that ABC was the only 8(a) qualified contractor in SBA Region IV that had experience with dredge disposal area maintenance in the context of an ID/IQ contract and that the Corps' focus on that experience effectively converted the nature of the contract. As defendant points out,

14. *Foundation Health Federal Services, Inc.,* 98–1 CPD ¶ 51 (1998), does not suggest a contrary result. There, the solicitation provided for the agency to evaluate an offeror's experience and performance in eight functional areas. As amended, the solicitation explicitly indicated that offerors who did not have military health experience in those eight areas would receive a neutral rating. Despite not having military health experience, the winning offeror received a rating above satisfactory, which increased its weighted technical score. The Comptroller held that this rating was inconsistent with the solicitation's neutral rating requirement. By comparison, nothing in the Solicitation specifically indicated that the lack of certain experience subsumed within the broader requirements of the contract would result in a neutral rating. Moreover, plaintiff actually had experience that was relevant to a number of the items listed as key tasks.

however, this argument is a crashing *non sequitur*.

Plaintiff again misconstrues the Solicitation, which did not make experience with ID/IQ contracts and dredge disposal area maintenance a mandatory minimum qualification, but rather merely a relevant experiential consideration. Evidence of this may be found not only in the provisions discussed above, but in the fact that five eligible 8(a) offerors submitted proposals that were found to be within the competitive range—three of which, *i.e.*, two besides the incumbent ABC, received very good performance ratings. The actual results of the competition thus belie any notion that the Solicitation was a disguised sole source procurement. Moreover, plaintiff has not begun to show that the references to ID/IQ contracts and dredge disposal area maintenance in the Solicitation were unduly restrictive and did not reflect the Corps' actual needs. In this regard, the case law mandates what common sense suggests, *to wit*, that the determination of an agency's needs is a matter within the broad discretion of agency officials. *XTRA Lease, Inc. v. United States*, 50 Fed.Cl. 612, 624–25 (2001); *Input/Output Tech., Inc. v. United States*, 44 Fed.Cl. 65, 72 n. 9 (1999). Here, there has not been the slightest showing that the agency's decision to consider these forms of experience was irrational, let alone any indication that plaintiff experienced competitive prejudice as a result.

Accordingly, there is no hint of a hidden agenda to make this a sole source contract—the Corps merely decided that one contractor, more than the others, met its *bona fide* needs. Such an approach is neither illegal nor irrational.

## III. CONCLUSION

That ends this matter. Based on the foregoing discussion, this court concludes that the injunctive relief requested here is inappropriate because plaintiff has not proven the merits of its claim. Thus, plaintiff's motion for judgment on the administrative record is DENIED and defendant's cross-motion for judgment on the administrative record is GRANTED. The Clerk shall enter judgment for defendant. Costs for the defendant.

